[No. 25721. Department One. November 6, 1935.]

MIKE REICHLIN, *Respondent and Cross-appellant, v.* FIRST NATIONAL BANK IN MONTESANO, *Appellant.*[1]

[1]Reported in 51 P. (2d) 380.

*W. H. Abel* and *O. M. Nelson,* for appellant.

*Thomas S. Grant* and *C. D. Cunningham,* for respondent and cross-appellant.

TOLMAN, J.—Respondent, as plaintiff, brought this action to recover damages for the unlawful detainer of certain farm lands, demanding judgment in the sum of $21,125. By answer, the unlawful detainer was denied, and certain affirmative defenses were pleaded. A trial was had to a jury, resulting in a verdict in the plaintiff's favor in the sum of $6,792. On motion for a new trial, the verdict was reduced to $4,500. There-

upon, the trial court set off against the reduced verdict a judgment theretofore duly entered against the plaintiff and in favor of the defendant in the sum of $2,575.10 (which had been pleaded as a set-off), and entered judgment against the defendant in the sum of $1,654.53, with costs.

The defendant has appealed from the judgment so entered, and the plaintiff has cross-appealed from that part only of the judgment which allows and establishes the set-off.

The issues are involved and complicated, and we shall endeavor to state the facts only so far as is necessary to an understanding of the questions to be decided.

It appears that, for a considerable period of time, the respondent had been residing upon the land in question and operating it as a dairy farm, first as lessee and afterwards under an executory contract to purchase. In February, 1932, being behind in his payments, respondent gave a quitclaim deed of the land to his grantor in the executory contract, but, as he claims, there was then an oral agreement or understanding between them to the effect that he should continue in possession; that a Federal farm loan should be applied for and obtained, if possible, and if obtained, the contract would be so rearranged as to enable the respondent to retain the land and pay out the purchase price.

The Federal loan was not obtained. The respondent remained in possession, but apparently litigation arose between the parties to the land contract, the exact nature of which is not disclosed by this record; except that a stipulation was entered into by the parties to that action, dated and filed September 20, 1933, in and by which the respondent Reichlin disclaimed any and all right, title and interest in the farm lands, dis-

claimed any interest as a tenant of the lands, and consented to a judgment in that cause establishing the title of his grantor and awarding her immediate possession.

In the meantime, the respondent had become indebted to the appellant in a considerable sum, to secure the payment of which he gave to the appellant a chattel mortgage upon his herd of dairy cattle. In February, 1933, this indebtedness was in default, and apparently respondent was deeply involved in financial difficulties. The appellant then began a statutory foreclosure of the chattel mortgage by notice and sale. The sheriff, on February 15, 1933, under that notice, seized the cattle described in the mortgage, placed a keeper in charge of them upon the farm, and gave notice of a sale to be there held on February 27, 1933. A sale was had accordingly, the appellant buying in the mortgaged cattle for one thousand dollars, which amount was credited upon the debt secured by the mortgage.

Thereafter, the appellant sued the respondent for the deficiency and recovered a judgment for upwards of $2,900. Execution was issued on this judgment, and on June 24, 1933, the sheriff sold respondent's interest in the lands in question thereunder to the appellant in this action for four hundred dollars, which amount was credited on the judgment. The judgment, less the credit by the amount of the execution sale, was pleaded and allowed by the trial court as a set-off to the verdict in this action.

The sheriff not only kept the mortgaged cattle on the land up to the day of sale, but the appellant, as the purchaser at the foreclosure sale, continued to keep and maintain the cattle on the farm after the sale. For some time, the respondent negotiated with his various creditors and sought some arrangement by which he might repurchase the cattle, but nothing was accom-

plished. In the latter part of April, 1933, for the first time, the respondent orally requested the appellant to remove the cattle from the farm, which was not done.

Later, the respondent, by nailing up the gates, caused the appellant to sue out a restraining order, which was granted, but with permission to respondent to serve a written notice upon the appellant to vacate the property and thereafter to pursue his legal rights. Such a written notice to quit and surrender the premises within three days was served on May 13, 1933, and there being a failure to comply, this action was thereafter commenced. The appellant retained possession, so far as to occupy the lands for the maintenance of his cattle, until some time in October, 1933.

Respondent's theory of damages, as disclosed by the complaint and the evidence offered on his behalf, was fourfold: (1) That appellant's use of the land for pasturage destroyed the hay crop which would otherwise have been raised, and thus deprived the respondent of the value of that crop, alleged to be $7,500; (2) that, because he was deprived of the income from the farm, the respondent was unable to meet the terms of his contract to purchase and thus lost the payments theretofore made and the improvements he had put upon the land, to his damage in the sum of $10,000; (3) that the reasonable rental value of the land was $150 per month, and respondent was thus damaged to the extent of $1,125; and (4) that, when appellant took possession, there were one thousand tons of manure on the premises belonging to respondent of the value of $2.50 per ton, which were converted by the appellant, to respondent's damages in the sum of $2,500.

The appellant pleaded as one of its affirmative defenses that the plaintiff, respondent here, is an alien and therefore is not entitled to maintain this action.

Many errors are assigned, but we shall consider

only those which may have affected the result or which might affect the result on a new trial.

■ The complaint pleads unlawful detainer, and the evidence goes no further. The trial court instructed the jury that, if they found from the evidence that the appellant made use of the courts to restrain the respondent from taking steps to regain possession, then that would amount in law to a forcible detainer. This was error. Respondent's own testimony clearly shows that the entry and the possession thereafter for a considerable time were with his consent. Therefore, the statutory written notice was necessary. The respondent was not restrained from giving such notice, and it was prejudicial error to submit to the jury the question of forcible detainer.

■ The jury was instructed:

"You are instructed that the plaintiff is entitled to recover only the fair rental value of the premises for the period that the defendant occupied said premises from the 27th day of February, 1933, to the 1st day of October, 1933.

"Evidence has been introduced to show the amount of hay that could be produced upon the land in question and the amount of manure used during said period of occupancy by the defendant.

"You are instructed that in determining the fair rental value of said land you are to take into consideration, from the evidence, the productive capacity of said land in arriving at a fair rental value.

"The defendant would be entitled to the full use of said land during its occupancy, and to whatever the land was capable of producing during the period of occupancy."

While not happily worded, we construe this instruction to mean that the measure of damages for the unlawful detention is the fair rental value, and that the other matters mentioned are to be considered only in determining what the fair rental value might be. So

construed, the instruction was correct, but the very next instruction given told the jury that if the plaintiff was entitled to recover, he should be allowed (a) the value of use during the period of detention, and (b) for the loss of profits. This clearly invites a double recovery. The next two instructions following again told the jury, "the plaintiff is entitled to recover only the rental value," thus emphasizing the inconsistency and adding to the confusion. Having determined that the measure of damages was the fair rental value, that measure alone should have been given to the jury.

In a final instruction, the jury was told that the rental value as fixed by the verdict could not exceed $150 per month, as alleged in the complaint. No exception was taken to this instruction, and it therefore became the law of the case. The respondent having withdrawn his claim for the value of improvements claimed to have been lost to him, and the court having refused to submit to the jury the question of the value of the manure alleged to have been appropriated, the only issue left and properly before the jury was the fair rental value of the land during the period of detention.

In several instructions, the jury was permitted to fix the beginning of the period as of the date of the sheriff's sale. Clearly, this was error. So long as respondent was negotiating for the repurchase of the cattle, it was to his advantage to have them remain upon the farm. Under such circumstances, the law does not imply a promise to pay for the use of the land. Not until those negotiations ceased and the appellant was advised that the cattle were no longer being kept on the farm at the request and for the benefit of the respondent, would an implied promise to pay rent come into being. Since, according to respondent's own testimony, this did not occur until the latter part of April,

1933, the rental could, under the allegations of the complaint, in no event have amounted to more than $825.

Respondent being in possession of farm land under an executory contract to purchase, the court properly instructed that the sheriff's sale of his interest in the land would not divest his right to possession during the year of redemption.

It will be seen from what has been said that no fact was alleged and no proof was offered showing or tending to show permanent damages to the real estate caused by the appellant during the time of the detention. The value of the use and occupancy, therefore, was, under what seems to be the universal rule, the sole measure of damages. The value of the use and occupancy and the fair rental value seem to be one and the same thing, and under the issues submitted to the jury, no verdict could be properly returned save one based upon that measure.

3 Sedgwick on Damages (9th ed.), § 999e, gives the rule as follows:

"Where one occupies land of another without an express covenant to pay rent, the owner may recover the rental value of the land in an action for use and occupation. The rental value is the actual value for profitable use, not the value of the use which the owner meant to make of it."

*Meeker v. Gardella,* 1 Wash. 139, 23 Pac. 837; *Owens v. Layton,* 133 Wash. 346, 233 Pac. 645.

There was no error in refusing to dismiss upon the ground that the respondent was an alien. *Oregon Mortgage Co. v. Carstens,* 16 Wash. 165, 47 Pac. 421, 35 L. R. A. 841; *Goon Gan v. Richardson,* 16 Wash. 373, 47 Pac. 762; *Abrams v. State,* 45 Wash. 327, 88 Pac. 327, 9 L. R. A. (N. S.) 186, 122 Am. St. 914; *Keene v. Zindorf,* 81 Wash. 152, 142 Pac. 484; and *Prentice v. How,* 84 Wash. 136, 146 Pac. 388.

■ In support of his cross-appeal, the respondent argues that the trial court erred in refusing to submit to the jury the question of the conversion of the manure which was on the detained premises. That question is not before us. The cross-appeal is based solely upon the allowance by the trial court of the set-off, and that ruling, being the only one appealed from, is the only one which we can consider on the cross-appeal. We therefore proceed to the consideration of the question of set-off.

■ The statute, Rem. Rev. Stat., § 266 [P. C. § 8353], provides:

"The defendant in a civil action upon a contract expressed or implied, may set off any demand of a like nature against the plaintiff in interest, which existed and belonged to him at the time of the commencement of the suit."

This should not be confused with the preceding sections which relate to counterclaims.

We have held that a counterclaim arising out of tort cannot be pleaded as a defense in an action arising out of contract or vice versa (*Hyde v. Clausin,* 82 Wash. 218, 144 Pac. 50; *Eyers v. Burbank Co.,* 97 Wash. 220, 166 Pac. 656; and *Cunningham v. Long,* 134 Wash. 433, 235 Pac. 964), as we were bound to do by the terms of § 265 of the statute [P. C. § 8352], relating to counterclaims. The reason for the statutory limitation as to counterclaims seems, apparently, to be because a counterclaim is a cause of action in itself and presents an issue to be tried out. Therefore, the statute requires that the counterclaim must grow out of the transaction pleaded in the complaint, or else it must be a cause of action on contract and be pleaded against a like cause of action.

While set-off and counterclaim are terms often used

interchangeably, yet in many respects a set-off may be quite different from a counterclaim.

Section 266 of the statute, which we have quoted, seems to grant a privilege to a defendant in a civil action based upon a contract expressed or implied, but it denies no rights and is not intended to do so, so far as appears. The present action might, perhaps, be held to be a civil action based upon an implied contract to pay a reasonable rental even though there be allegations in the complaint sounding in tort. *Russell v. Union Machinery & Supply Co.*, 88 Wash. 532, 153 Pac. 341. But whether so or not, the statute, being affirmative and not negative, would seem to be no bar to the set-off which is here questioned.

The judgment which is set off is a liquidated demand of the highest order and form. A court of competent jurisdiction has passed upon certain issues and has entered a solemn judgment establishing finally an indebtedness certain in amount. So far as the set-off is concerned, there is nothing left to litigate, and it is beyond the power of a jury or of the court itself (except in special instances) to deny or defeat the right of a judgment creditor to receive the sum due him from the judgment debtor. Hence, a judgment, especially a judgment entered by the same court, when pleaded as a set-off, must, as a matter of law, be credited upon any recovery which the judgment debtor, as plaintiff, may establish against the judgment creditor as defendant. No other course would be equitable.

''The doctrine of set-off, whether legal or equitable, is essentially a doctrine of equity. It was that natural justice and equity which dictated that the demands of parties, mutually indebted, should be set off against each other, and only the balance recovered, that gave birth to the idea of accomplishing the result in a judicial proceeding. The common law, for simplicity of procedure, determined otherwise, and held that each

claim must be prosecuted separately. By the civil law, from which the great body of our system of equity comes, a cross debt was, by mere operation of law, without any act of the parties, extinguished. It was treated as an absolute payment. Courts of equity in this country, while not going so far, have accomplished the same results by allowing set-offs in cases where they could not be granted at law." 24 R. C. L. 799.

See, also, 57 C. J. 362.

An equitable set-off should certainly be recognized in jurisdictions like our own, where equitable defenses to actions at law are authorized by statute.

In 2 Freeman on Judgments (5th ed.), § 1143, p. 2383, it is stated:

"To be the subject of set-off a judgment must be one for money, which may be enforced by execution. If judgments are in part only for money they may be off-set to that extent but no further. But it is no objection to set-off of judgments that the claims upon which they were based could not have been offset against each other. A judgment founded upon contract may be set off against a judgment for damages suffered from a tort, and vice versa. The fact that the claim upon which a judgment was obtained was an unliquidated one is no objection to offsetting such judgment against another one, since when reduced to judgment the claim becomes liquidated and merged. Judgments cannot be offset until they have become final and conclusive, and where the pendency of an appeal prevents such finality, it will prevent the set-off, particularly where execution of the judgment has been stayed."

In *Arn v. Elms*, 59 Okla. 235, 158 Pac. 1150, it was held that, where there are mutual judgments in the same court between the same parties, the court has the power to set off one judgment against the other, but the power to set off mutual judgments is discretionary, to be exercised on strictly equitable principles.

In *Snow v. West*, 37 Utah 528, 110 Pac. 52, the court stated that whether mutual judgments may be satis-

fied by being set off against each other rests largely within the court's discretion, and judgments may be set off where the right to do so is clear, but ordinarily, where different interests are involved, the application to set off judgments should be made in equity and controlled by equitable principles.

In *Herman v. Miller,* 17 Kan. 328, it was stated that, while courts have the power to set off judgments upon motion, yet the exercise of that power is in a measure discretionary, and it will not be exercised in cases in which it would be inequitable to do so.

In *Schuler v. Collins,* 63 Kan. 372, 65 Pac. 662, it is said:

"The existence of mutual judgments does not entitle a party to have one set off against the other arbitrarily as a matter of right. Whether application for setoff is by motion or through a proceeding in equity, it is to be determined upon equitable considerations, and is only allowed when it will promote substantial justice."

In *Reed v. Smith,* 158 Fed. 889, the United States district court held:

"The fact that one judgment is in tort and another in contract does not of necessity bar their set-off if such a course be equitable. The real and only test in any case is whether or not in equity and good conscience the set-off should be allowed."

To the same effect are *Langston v. Roby,* 68 Ga. 406, and *Puett v. Beard,* 86 Ind. 172, 44 Am. St. 280, holding that a judgment founded on contract may be set off against one founded on tort.

In *Spokane Security Finance Co. v. Bevan,* 172 Wash. 418, 20 P. (2d) 31, this court held that a judgment for slander of title may be offset against a larger judgment on a promissory note. This court there said:

"The determination of the matter of the set-off of one judgment against another pertains to a court of equity, and in deciding the matter the chancellor exer-

cises a sound discretion in view of all of the facts in the case. *Gauche v. Milbrath,* 105 Wis. 355, 81 N. W. 487.''

We therefore hold that the judgment here pleaded as a set-off was properly set off against the verdict, and that there was no error in the proceedings of which the cross-appellant can complain.

The judgment is reversed upon the main appeal, and the cause remanded for a new trial. The appellant will recover costs on appeal.

HOLCOMB, STEINERT, GERAGHTY, and MITCHELL, JJ., concur.